**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JOHN WATT, derivatively on behalf of CURO GROUP HOLDINGS CORP., | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| CHAD FAULKNER, ANDREW FRAWLEY, DON GAYHARDT, DAVID M. KIRCHHEIMER, CHRIS MASTO, MIKE MCKNIGHT, DOUG RIPPEL, DALE E. WILLIAMS, KAREN WINTERHOF, WILLIAM BAKER, ROGER W. DEAN, FRIEDMAN FLEISCHER & LOWE CAPITAL PARTNERS II, L.P., FFL EXECUTIVE PARTNERS II, L.P., AND FFL PARALLEL FUND II, L.P., | ) ) ) ) ) ) ) ) ) )   Case No. _____ ) ) ) ) |
| Defendants, | ) ) |
| - and - | ) |
| CURO GROUP HOLDINGS CORP., | ) ) |
| Nominal Defendant. | ) ) |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff John Watt ("Plaintiff"), by and through his undersigned counsel, brings this derivative complaint for the benefit of nominal defendant CURO Group Holdings Corp. ("CURO" or the "Company"), against Individual Defendants Chad Faulkner ("Faulkner"), Andrew Frawley ("Frawley"), Don Gayhardt ("Gayhardt"), David M. Kirchheimer ("Kirchheimer"), Chris Masto ("Masto"), Mike McKnight ("McKnight"), Doug Rippel ("Rippel"), Dale E. Williams ("Williams"), Karen Winterhof ("Winterhof"), William Baker ("Baker"), and Roger W. Dean ("Dean") (collectively, the "Individual Defendants), and certain entities associated with Friedman Fleischer & Lowe Capital Partners II, L.P., FFL Executive Partners II, L.P., and FFL Parallel Fund II, L.P., (together, the "FFL Defendants") for violations of the federal securities laws, breaches of

1

their non-exculpable fiduciary duties, and other serious misconduct. The Individual Defendants are all current CURO senior officers and/or members of the Company's Board of Directors (the "Board"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by CURO with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I. NATURE AND SUMMARY OF THE ACTION

1.      This stockholder derivative action is brought for the benefit of CURO and is based on violations of federal securities laws, breaches of fiduciary duties, and other serious misconduct committed from approximately April 26, 2018 through the present (the "Relevant Period") by the Individual Defendants, who are all current directors and officers of CURO.

2.      This case is relatively straightforward. During the Relevant Period, according to its public filings, CURO provided lending products to nonprime, underbanked consumers in need of cash in the United States, Canada, and the United Kingdom. Essentially, CURO operated as a payday lender, and its most profitable single line of business was its Canadian "single-pay" loans. "Single-pay" loans are often referred to in common usages as "payday" loans. In 2016 and 2017, various new laws and regulations in Canada imposed restrictions on single-pay loans, which decreased CURO's yield on the single-pay loans in Canada. This is relevant because CURO derived substantial revenues (and profits) from its lucrative Canadian operations.

3.      In response to the new laws and regulations in Canada, the Individual Defendants developed a strategy to transition CURO's Canadian business from single-pay loans to installment and "open-end" loan products. Pursuant to that strategy, the Company began to convert single-pay customers to installment and open-end loans in Alberta, Canada. The Company then opened test

stores in one market in Windsor, Ontario, before effecting the transition in the broader Ontario market.

4.      The Individual Defendants knew that open-end loans would be less profitable for CURO than its historical single-pay loans initially because: (i) the interest rates CURO could charge on open-end loans was less than comparable single-pay loans; (ii) the revenue on open-end loans takes longer to build; (iii) due to accounting rules, CURO was required to account for increased loan losses "upfront" (at the time of origination) for open-end loans as compared to single-pay loans. During mid-2018, the Individual Defendants assured stockholders that the transition away from CURO's most profitable line of business (single-pay loans) would not be immediate; that single-pay loans would remain viable; and that the negative impact would be minimal, would be confined to the second quarter of 2018, and had been factored into CURO's publicly-reported 2018 financial guidance. The Individual Defendants further reaffirmed the Company's fiscal 2018 guidance in late April 2018 and at the end of July 2018.

5.      However, unbeknownst to stockholders, the Individual Defendants had already decided to accelerate the transition from single-pay to open-end loans in Ontario, and the transition was significantly ramped up beginning in May 2018, prior to the Individual Defendants' affirmation of fiscal 2018 guidance in April and July 2018. Importantly, the majority of the losses (mainly as a result of increased "charge offs") from the transition had already occurred by July 2018. In October 2018, the Individual Defendants announced dismal third quarter financial results, and significantly reduced the Company's 2018 guidance for income and earnings. Following this disclosure, CURO's stock fell almost 34%.

6.      During this time between April and October 2018 when Plaintiff alleges that the Individual Defendants were withholding the true problems facing CURO, on May 17, 2018, the Individual Defendants approved a secondary stock offering of CURO common stock (the

"Secondary Offering"), wherein defendants Faulkner and McKnight and the FFL Defendants sold approximately 4.5 million shares for proceeds of approximately $98 million. The Company did not receive any of the proceeds from the Secondary Offering -- in other words, it only benefitted top insiders. Moreover, the Registration Statement on SEC Form S-1 did not disclose any of the financial impacts of CURO's transition from single-pay to open-end loans described in the preceding paragraphs, which was clearly material information that stockholders had a right to know.

7.    Based on these events, as discussed further herein, a securities fraud class action was subsequently filed against CURO and certain other defendants, including several current members of the Board, in the United States District Court for the District of Kansas, on behalf of a class of CURO investors. This securities class action would eventually be sustained in its entirety by the District of Kansas in December 2019, notwithstanding the materially heightened pleading standards applicable to federal securities fraud claims.

8.    Plaintiff brings derivative claims for violations of federal securities laws, breaches of fiduciary duties, unjust enrichment, insider trading and aiding and abetting against the Individual Defendants and the FFL Defendants named herein to recover the damages suffered by CURO for their actions.

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

10.    This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant CURO is incorporated in this District and conducts business in this District.

## III.    PARTIES

**Plaintiff**

13.     Plaintiff is a current holder of CURO common stock and has continuously held CURO common stock during the Relevant Period.

**Nominal Defendant**

14.     Nominal defendant CURO is a Delaware corporation with its headquarters located at 3527 North Ridge Road, Wichita, Kansas 67205. According to the Company's most recent 10-K, it describes itself as "a growth-oriented, technology-enabled, highly-diversified, multi-channel and multi-product consumer finance company serving a wide range of underbanked consumers in the United States ("U.S.") and Canada." The Company operates in the U.S. under two principal brands, "Speedy Cash" and "Rapid Cash," as well as under the "Avio Credit" brand; and Canada under "Cash Money" and "LendDirect" brands. According to the Company's 2020 10-K, as of December 31, 2019, CURO's store network consisted of 416 locations across 14 U.S. states and seven Canadian provinces, and online services in 27 U.S. states and five Canadian provinces. CURO's common stock began trading on the NYSE on December 7, 2017, under the symbol "CURO." Prior to this date there was no public market for the Company's common stock.

**The Individual Defendants**

15.     Defendant Faulkner co-founded the Company and has served on the Board since 1997. Defendant Faulkner previously served as President and Chief Operating Officer ("COO") of CURO from 1997 to 2013 and currently serves as a director of certain of the Company's wholly-owned subsidiaries. Mr. Faulkner co-owns with the other co-founders of the Company certain real estate companies from which CURO leases some of its corporate stores and offices.

16.     Defendant Frawley has served on the Board since December 2017. Frawley is the Chief Executive Officer ("CEO") and Vice Chairman of the board of directors of V12 Data. Mr. Frawley is also the CEO of AJ Frawley & Associates LLC, a consulting firm providing services to private equity firms and brands. Defendant Frawley previously served as CEO of Epsilon, a segment of Alliance Data Systems Corporation (NYSE: ADS) from December 2014 to September 2016. Frawley is a member of the board of directors of Fluent, LLC (NASDAQ: FLNT). Frawley served the Board's Audit and Compensation Committees during the Relevant Period.

17.     Defendant Gayhardt has served as the Company's CEO since January 2012, as the Company's President since July 2013, and as a director since December 2012. Prior to joining the Company, defendant Gayhardt worked in various capacities at Dollar Financial Corp. (now known as DFC Global Corp. ("DFCGC")), from 1990 to 2008, including as DFCGC's President from 1998 to 2008. Like CURO, DFCGC's business centers on providing financial services to unbanked and underbanked consumers.

18.     Defendant Kirchheimer has served on the Board since December 2018. Kirchheimer is an advisory partner at Oaktree Capital Management, L.P., a global investment manager specializing in alternative investments ("Oaktree"), where he previously served as Chief Financial Officer ("CFO") from its founding in 1995 until his retirement in March 2017. Defendant Kirchheimer also served as Oaktree's Chief Administrative Officer and head of accounting during

most of his tenure. Prior to Oaktree, defendant Kirchheimer held senior financial management positions with Ticketmaster Corporation, Republic Pictures Corporation, The Zond Group and Price Waterhouse (now PricewaterhouseCoopers). Kirchheimer is a member of the board of directors of Nuveen Churchill BDC Inc. Kirchheimer served as a member of the Board's Audit and Compensation Committees during the Relevant Period.

19.     Defendant Masto has served on the Board since 2008 and as Lead Independent Director since April 2020. Defendant Masto is Co-Founder and Senior Advisor at FFL Partners, a private equity firm, which he co-founded in 1997 and where, until 2017, he served as a Partner, member of the Investment Committee and member of firm leadership. Prior to co-founding FFL Partners, defendant Masto worked as a management consultant with Bain & Company and was employed at Morgan Stanley & Co. (NYSE: MS), where he worked as an investment banker. Defendant Masto also currently serves on the board of directors of Enjoy Beer LLC, VolunteerMatch and Resident and is an Advisory Board Member of Valo Ventures. Masto served as a member of the Board's Compensation and Nominating and Corporate Governance Committees during the Relevant Period.

20.     Defendant McKnight co-founded the Company and has served on the Board since 1997. From 1997 to 2008, defendant McKnight served as Vice President of the Company and was involved with the Company's strategic direction and governmental affairs. Defendant McKnight co-owns with the other co-founders certain real estate companies from which the Company leases some of the Company's corporate stores and offices. Since 2011, defendant McKnight has served as a director of Gusto, LLC, Decorus Investments, LLC and CDM Development, LLC, and has been a Partner of Tacoma Capital since 2016. Defendant McKnight sold 500,000 shares of CURO stock during the Relevant Period, generating more than $10.9 million in proceeds.

21.    Defendant Rippel co-founded the Company and has served as Executive Chairman of the Board since 2012. Before that, defendant Rippel was Chairman of the Board from 2008 to 2012, CEO of CURO from 1997 to January 2012, and Secretary and Treasurer of CURO from 1997 to 2008.

22.    Defendant Williams has served as a member of the Board since 2017, and is the current Chair of the Audit Committee.

23.    Defendant Winterhof has served as a member of the Board since 2016, and also currently serves as a director of FFL Partners.

24.    Defendant Baker joined the Company in 2007 and has served in various executive roles at various times since then.  Most recently, Baker has served as COO of CURO since 2016.

25.    Defendant Dean has served as the Company's Executive Vice President and CFO since 2016.

26.    Defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams, Winterhof, Baker, and Dean are referred to herein as the "Individual Defendants."

27.    Defendants Rippel, Masto and McKnight are co-founders of the Company and are collectively referred to herein as the "Founder Defendants."

28.    As of the filing of the Company's 2019 10-K, the Company's directors and senior officers owned approximately 21 million shares of the Company's common stock which corresponds to 51.46% of the total outstanding shares. This outright majority ownership excludes the FFL Defendants' stock ownership, which is described below.

**The FFL Defendants**

29.    Defendants Friedman Fleischer & Lowe Capital Partners II, L.P., FFL Executive Partners II, L.P., and FFL Parallel Fund II, L.P., made a significant investment in the Company in 2008 and, according to CURO's public filings, "ha[ve] contributed significant resources to helping

define our growth strategy." The FFL Defendants sold 3,497,411 shares at a net price of $21.85 (after underwriting discounts and commissions) for proceeds of more than $76 million during the Secondary Offering. This sale reduced the FFL Defendants' holdings of CURO stock from 13,212,000 shares to 9,714,589 shares and decreased their percentage of total common stock and voting power from 29% to 21.23%.

30.     According to CURO's public filings, the Founder Defendants and the FFL Defendants controlled CURO and collectively had the ability to elect all of the members of CURO's Board and "thereby control[led] [CURO's] policies and operations, including the appointment of management." Accordingly, the Founder Defendants and the FFL Defendants exerted actual control over both CURO and the Individual Defendants throughout the Relevant Period. As the Company's 2019 10-K explicitly states:

> *Friedman Fleischer & Lowe Capital Partners II, L.P. and its affiliated investment funds ("FFL Holders") and the original founders of the company ("Founder Holders") together own more than 50% of our common stock, and their interests may conflict with ours or yours in the future.*
>
> *At December 31, 2019, FFL Holders and Founder Holders owned approximately 11.8% and 47.7%, respectively, of our outstanding common stock. As a result, the FFL Holders and the Founder Holders collectively have the ability to elect all of the members of our Board of Directors and thereby control our policies and operations, including the appointment of management*, future issuances of our common stock or other securities, the payment of dividends, if any, on our common stock, the incurrence or modification of debt by us, certain amendments to our amended and restated certificate of incorporation and amended and restated bylaws, and the entering into of extraordinary transactions, and their interests may not in all cases be aligned with your interests. In addition, the FFL Holders together with Founder Holders may have an interest in pursuing acquisitions, divestitures and other transactions that, in their respective judgment, could enhance their investment, even though such transactions might involve risks to you. For example, the FFL Holders together with the Founder Holders could cause us to make acquisitions that increase our indebtedness or cause us to sell revenue-generating assets.
>
> In connection with the completion of our IPO, we entered into the Amended and Restated Investors Rights Agreement with certain of our existing stockholders, including the Founder Holders and Freidman Fleisher & Lowe Capital Partners II,

L.P. (and its affiliated funds, the "FFL Funds"), whom we collectively refer to as the principal holders. Pursuant to the Amended and Restated Investors Rights Agreement, we have agreed to register the sale of shares of our common stock held by the stockholders party thereto under certain circumstances. We completed a registration pursuant to these registration rights in May 2018.

The FFL Holders are in the business of making investments in companies and may from time-to-time acquire and hold interests in businesses that compete directly or indirectly with us.

(Emphasis in original).

31.     The Founder Defendants and the FFL Defendants, by reason of their status as majority shareholders and/or directors, with "control" over the Company's "policies and operations" and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Founder Defendants and the FFL Defendants were able to, and did, directly or indirectly, control the Board and the conduct of CURO's business.

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

32.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

10

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

35.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

    a)  manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

    b)  neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

    c)  establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

    d)  neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

    e)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority

and disseminating truthful and accurate statements to the SEC and the investing public;

f)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

g)  to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

h)  ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

i)  remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

36.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the

Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants.

37.     The Company's Code of Business Conduct & Ethics (the "Ethics Code") explicitly applies to all officers of the Company and to all Board members. It is "designed to promote… honest and ethical conduct… full, fair, accurate, timely and understandable disclosure in the reports and documents CURO files with, or submits to, the Securities and Exchange Commission." Among other things, pursuant to the Ethics Code, the Individual Defendants were subject to the following requirements at all times:

**BUSINESS PRACTICES**

In our business operations, we deal fairly with our customers, colleagues and stockholders. We maintain accurate business records and comply with laws and regulations regarding financial disclosures and audits.

**Financial Disclosures**

CURO is committed to providing full, fair, accurate, timely and understandable disclosure in reports and documents that we file with, or submit to, the SEC and other regulatory agencies and in other public communications we make. You are required to comply with CURO's policies and procedures for compiling such disclosures and ensuring that they are full, fair, accurate, timely and understandable. If you contribute in any way to the preparation or verification of CURO's financial statements and other financial information, you must ensure that CURO's books, records and accounts are accurately maintained. You must cooperate fully with CURO's legal, accounting and internal audit departments, as well as CURO's independent public accountants and outside counsel. If you are involved in CURO's disclosure process, you must: (a) be familiar with and comply with CURO's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of CURO provide full, fair, accurate, timely and understandable disclosure.

**Insider Trading**

United States and international securities laws prohibit certain transactions involving securities (e.g., purchases or sales of CURO's stock, exercise and sale of CURO stock options) by persons who are aware of material information that is not generally known by or available to the public. These laws also prohibit persons who are aware of material non-public information from "tipping," which means disclosing this information to others. In addition to possible fines and penalties to

you, CURO's reputation and prospects could suffer and our brand could be impaired if these laws are not followed. You may not purchase or sell CURO stock while in possession of material non-public information regarding CURO, nor may you purchase or sell another company's securities while in possession of material non-public information regarding that company. It is against CURO's policies and illegal for you to use material non-public information regarding CURO or any other company to: (a) obtain profit, or (b) directly or indirectly "tip" others who might make an investment decision on the basis of that information.

You must review CURO's Insider Trading Policy, a copy of which can be requested from the Legal Department. Additionally, you can contact the Legal Department to learn more about material, non-public information, prohibited transactions and trading windows.

38.    Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are required to assist the Board in monitoring, among other things: (1) the integrity of the Company's financial statements, (2) the design and implementation of the Company's internal audit function, (3) the qualifications, independence and performance of the Company's independent auditor and (4) the Company's compliance with legal and regulatory requirements.

39.    The Audit Committee Charter also specifically provides that the Audit Committee members have the following duties:

1.    Review the policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with generally accepted accounting principles ("GAAP"), applicable rules of the SEC and the NYSE Rules.

2.    Review the Company's accounting and financial reporting processes

3.    Review audits of the Company's financial statements.

4.    Review and discuss with Senior Management and the Company's Vice President of Internal Audit:(a) the Independent Auditor's responsibilities under generally accepted auditing standards and the responsibilities of Senior Management in the audit process, (b) the overall audit strategy, (c) the scope and timing of the annual audit, (d) any significant risks identified during the Independent Auditor's risk assessment procedures and (e) when completed, the results, including significant findings, of the annual audit.

5.     Review and approve the Company's Annual Report on Form 10-K (the "10-K") and Quarterly Reports on Form 10-Q (the "10-Qs").

6.     Review and discuss with the Independent Auditor, Senior Management and the Company's Vice President of Internal Audit any information regarding consultation and technical advice opinions sought by Senior Management from any other accounting firm with respect to the accounting treatment of a particular event or transaction.

7.     Review and discuss reports from the Independent Auditor regarding: (a) all critical accounting policies and practices to be used by the Company; (b) all alternative treatments of financial information within GAAP that have been discussed with Senior Management, including ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Independent Auditor; (c) other material written communications between the Independent Auditor and Senior Management, such as any management letter or schedule of unadjusted differences; and (d) any other matters regarding which the Independent Auditor is required, or chooses, to discuss or report to the Committee under applicable standards of the Public Company Accounting Oversight Board ("PCAOB") or otherwise.

8.     Review all certifications required to be made by the Company's Chief Executive Officer and Chief Financial Officer (the "CFO") in connection with the Company's periodic reports under the Act or pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act ("SOX").

9.     Meet to review and discuss with Senior Management and the Independent Auditor the Company's annual audited financial statements and quarterly financial statements in the 10-Kand 10-Qs, respectively, as well as the specific disclosures made under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" of such reports.

10.     Recommend to the Board that the Company's audited financial statements be included in the 10-K.

11.     Review and discuss the Company's earnings press releases (including type and presentation of information, paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to the public, analysts and ratings agencies. The Committee may discuss these matters generally and need not discuss these matters in advance of each earnings release or each instance where earnings guidance is provided.

12.     Prepare and approve the report required by the rules of the SEC to be included in the Company's annual meeting proxy statement in accordance with the requirements of Item 7(d) of Schedule 14A and Item 407(d)(3)(i) of Regulation S-K.

13.     In compliance with the Company's Related Person Transactions Policy, review and oversee all related party transactions that are required to be disclosed pursuant to Item 404 of Regulation S-K on an ongoing basis and, if appropriate, approve any such transactions.

14.     Review and discuss with the Independent Auditor the Independent Auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

15.     Meet separately, periodically, in executive sessions with Senior Management, the Company's Vice President of Internal Audit and the Independent Auditor.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   CURO's History

40.     Founded in Riverside, California in 1997, CURO's public filings describe the Company as "a growth oriented, technology-enabled, highly diversified consumer finance company serving a wide range of underbanked consumers." CURO provides lending products to nonprime, underbanked consumers in need of cash, targeting consumers with a FICO score of 660 or less. These individuals often have been rejected by traditional banking services and are looking for other nonbank options, need cash in between paychecks, or need access to financial services outside of normal banking hours.

41.     Through acquisitions and organic growth, including the launch of new brands, the Company has expanded across the U.S., Canada, and had historic (but now discontinued) operations in the U.K. CURO's Canadian stores are branded "Cash Money" and the Company offers "LendDirect" installment loans online and at certain stores.

42.     During the Relevant Period, CURO's Canadian operations accounted for a significant amount of the Company's profitability. During 2017, CURO's Canadian segment generated 19% of revenues and accounted for approximately 19.5% and 55% of gross margin and

pre-tax income, respectively. During 2018, Canadian operations accounted for approximately 12% of gross margin and generated pre-tax income of approximately $17 million, while its U.S. operations generated pre-tax income of only $1.1 million, and its U.K. operations generated a pre-tax loss of $38.7 million. The Ontario market was particularly important to the Company's operations. In 2017, almost 13% of the Company's total consolidated revenues came from Ontario, which was the Company's third largest geographic region behind California and Texas.

43.     Throughout the Relevant Period, the Individual Defendants repeatedly touted CURO's proprietary IT platform, called the "CURO Platform," for every aspect of the Company's underwriting and scoring of its loan products. Among other information, the CURO Platform captures transactional history by store and customer, which allows the Company to track loan originations, payments, defaults, and payoffs, as well as historical collection activities on past-due accounts. The CURO Platform enabled CURO to make real-time, data-driven changes to its acquisition and risk models. The Company also uses the CURO Platform to decide whether to extend credit to prospective customers and the terms on which to provide credit.

44.     During the Relevant Period, CURO offered single-pay loans, installment, and open-end lines of credit, and a number of ancillary financial products including check cashing, gold buying, and credit protection insurance. The subject of this shareholder derivative action is the Company's single-pay and open-end loans.

45.     Single-pay loans, commonly referred to as payday loans, are generally high yield, but short-term, small denomination loans that provide a customer with immediate cash in exchange for a post-dated personal check or a pre-authorized debit from the customer's bank account. CURO charges customers a fee based on the amount of money borrowed and, in exchange, it defers deposit of the check or debit from the customer's account until the loan due date, which typically falls on the customer's next pay date.

46.     Open-end loans are a lower yield line of credit without a specified maturity date. Customers are free to borrow against their line of credit, and repay with minimum, partial, or full payment and redraw as needed. CURO earns interest on the outstanding loan balances drawn by the customer against their approved credit limit.

47.     Because pay-day loans are unsecured, or not backed by an asset such as a house (for a mortgage) or a car title (for an auto loan), credit losses are a sizeable, inherent part of the pay-day lending business. As a result, the Company is required to create an accounting reserve, or "allowance for loan losses," for those probable credit losses under Generally Accepted Accounting Rules ("GAAP"). To establish and maintain its allowance for loan losses, CURO takes a "provision," which is a periodic charge against its earnings. Calculating the provision for losses requires CURO to consider a variety of quantitative and qualitative factors regarding the loans originated by CURO. With installment and open-end loans, CURO is required to reserve for expected losses through a provision at the time of origination, even though revenues from those loans cannot be recognized until payments on the loan balances are collected from customers over time. Thus, as CURO transitioned from small, short term single-pay loans to larger, longer term open-end loans, CURO had to take larger "up-front" provisions (or charges) against expected credit losses.

48.     Because CURO's open-end loans traditionally had higher loan balances as compared to the Company's single-pay loans, the up-front provisions CURO was required to take on its open-end loans were also materially higher. The average single-pay loan was approximately $600, while the average open-end loan was approximately $2,400, with the average amount drawn of approximately $1,800, which is three times the size of the average payday loan.

B.     **Canadian Operations Suffer Due to Increased Regulatory Oversight**

49.    Canadian single-pay loans were historically the Company's most profitable line of business, generating yields as high as 400% and were accompanied by modest, predictable credit losses. For the year ended December 31, 2017, single-pay loans comprised 27.9% of the Company's total revenues, almost half of which (15%) were derived from Canada. Tightening payday lending regulations in Canada, however, threatened the profitability of CURO's single-pay loans.

50.    Payday loans can be extremely expensive to borrowers, with annual interest rates ranging from 200% to more than 500%, depending on the state or province in which the loan is made. This extreme expense to customers corresponds to extreme profitability to CURO. Maximum interest rates are set under state laws (for the United States) and by province (in Canada). If borrowers cannot repay their loans on time, they often borrow more and deepen their debt, becoming trapped in a cycle of ultra-high interest debt that is difficult to break. This cycle of adding on new debt to pay back the original debt can turn a single, unaffordable loan into a long-term debt trap.

51.    Given the extremely high interests rates and the inherent nature of payday loans, the payday lending industry is heavily regulated by governmental authorities. The Canadian provincial payday lending regulations generally relate to cost of borrowing and related caps, disclosure requirements, collection activity requirements, and restrictions on certain types of lending practices. In the years prior to the Relevant Period, a number of Canadian provinces began cracking down on payday lenders by passing new legislation that further restricted their lending practices (and reduced maximum interest rates) in order to protect Canadians from becoming trapped in never-ending debt cycles.

52.     In May 2016, the Alberta provincial government introduced Bill 15, "An Act to End Predatory Lending," which lowered the borrowing rate for single-pay loans from C\$23 to C\$15 for every C\$100 borrowed, making it the lowest rate in Canada. The proposed legislation also included provisions requiring lenders to allow borrowers to repay payday loans in installments, rather than all at once, and prohibiting lenders from directly soliciting potential customers, charging a fee to cash a check for a payday loan, and offering a loan when another is outstanding, among other changes. The C\$15 rate cap became effective in August 2016 and final regulations for the installment payments became effective in November 2016.

53.     In November 2016, the Ontario provincial government passed new legislation which reduced the total cost of borrowing on single-pay loans from C\$21 to C\$18 for every C\$100 borrowed, with the new law becoming effective January 1, 2017.

54.     Similarly, effective January 1, 2017, the British Columbia provincial government reduced the total cost of borrowing from C\$23 to C\$17 for every C\$100 borrowed. When the British Columbia Ministry announced this regulatory change, it also stated that it was considering whether, and to what extent, additional regulations may be warranted.

55.     In December 2017, the Ontario provincial government tightened regulations again, capping the cost to borrowers of single-pay loans at C\$15 for every C\$100 borrowed, with the new regulation becoming effective on January 1, 2018. Ontario also announced further amendments effective July 1, 2018, that required: (i) a mandatory extended payment plan for borrowers with three or more loans with the same lender within a 63-day period; (ii) a requirement that the loan amount cannot exceed 50% of the customer's net pay in the month prior to the loan; and (iii) mandatory disclosures in advertisements and loan agreements about the cost of borrowing a payday loan. CURO's Ontario operations consisted of 133 stores (out of a total of 202) as of the end of the 2019 calendar year.

56.     Because regulations in Canada necessarily impacted CURO's operations, the Individual Defendants closely monitored and routinely discussed the Canadian regulatory environment and any proposed or final regulations in the Company's SEC filings. The Individual Defendants also spoke about the topic on every quarterly earnings conference call since becoming a publicly traded Company, and regularly provided updates on existing or proposed legislation and answered questions from analysts about the impact of new regulations.

57.     As a result of new regulations in Alberta, British Columbia, and Ontario that lowered the borrowing rates on payday loans, CURO's business suffered and the Company's yields single-pay loans fell dramatically. In 2016, for example, the yields on single-pay loans in Canada were nearly 400%, but by the first quarter of calendar 2018 ("1Q18"), single-pay yields had declined substantially and were hovering around 250%.

58.     The Individual Defendants recognized that due to these new Canadian regulations, single-pay loans were no longer the profit center they had historically been. The solution the Individual Defendants pursued was for the Company to transition out of single-pay loans in Canada into other product offerings like installment and open-end loans which were not subject to the same regulatory reforms as the payday loans.

59.     Further, given the importance of the Ontario market to CURO's operations, the Company's ability to replace revenues derived from single-pay loans with revenues from other product offerings was especially critical. Because open-end loans have lower average yields than single-pay loans, the only way for CURO to make up that "lost" revenue would be for the Company to significantly increase the volume of open-end loans to offset the decline in single-pay revenues.

C.      **The Individual Defendants Implement a Plan to Transition CURO's Canadian Customers from Single-Pay to Installment and Open-End Loans**

60.     As a result of the regulatory changes in Canada, the Individual Defendants implemented a strategy to transition customers in Alberta and Ontario – which together accounted for 80% of the Company's Canadian revenues – away from single-pay loans and into installment and open-end loans.

61.     The transition began in Alberta where, pursuant to the Individual Defendants' direction, CURO converted existing single-pay customers into installment and then open-end loans and also acquired new open-end customers. The Company experienced "really good" demand in Alberta and the Individual Defendants represented that "converting existing customers [was] going excellent."

62.     In its fourth quarter 2017 ("4Q17"), CURO began opening small format LendDirect loan offices in Ontario, which focused on unsecured installment and open-end loans, rather than payday loans. In February 2018, CURO began testing open-end loans in the Windsor, Ontario market and, during the initial test phase, converted nearly 3,000 single-pay loans to open-end loans. The Company also continued expanding its LendDirect stores, opening two more stores in Canada during 1Q18. According to the Individual Defendants, the Company was "very pleased" with the foot traffic, take-up rate, and first-pay default rates on the LendDirect open-end loan product.

63.     Based on the positive results in the Ontario test markets, and the recent regulatory changes, during 1Q18, the Individual Defendants decided to accelerate the transition from single-pay to open-end loans in the Ontario market by an entire year – from 2019 to 2018. Although the Company was transitioning away from its most profitable single line of business into the lower yield open-end loans, the Individual Defendants reassured stockholders during CURO's 1Q18 earnings conference call on April 27, 2018 that despite the recent rate changes in Ontario, which

the Company had "anticipated," single-pay lending would remain "viable in Ontario." Defendant Gayhardt clarified that the Company's transition out of single-pay loans in Canada would not be immediate or rapid, but would occur over the "next couple of years."

64.     During the Company's 1Q18 earnings conference call, defendant Gayhardt also explained that the up-front provisioning resulting from the Canadian transition would have a negligible impact on the Company's operations, stating that as the Company continued to grow its open-end business, "the revenue and profitability from [installment and open-end] products [would] lag a little bit just because of the way you have to provision upfront." The Individual Defendants further assured stockholders that the Company had "anticipated" any increased upfront provisioning from the Canadian transition "when we developed our forecast and our guidance" and that there was nothing "going on in terms of mix shift or the overall kind of growth trends" that was out of line with the Company's forecast.

65.     These statements led stockholders to believe that the Company's transition out of single-pay loans in Canada, and Ontario in particular, would not impact the Company's overall financial results and ability to maintain and meet FY18 guidance. In fact, during the April 27, 2018 earnings conference call, the Individual Defendants stated they were "very happy to affirm" the Company's FY18 guidance, which included net income in the range of $110 million to $116 million, adjusted EBITDA in the range of $245 million to $255 million, and EPS of $2.25 to $2.40.

D.     **The Individual Defendants Cause CURO to Conduct a Secondary Stock Offering**

66.     On May 14, 2018, the Individual Defendants caused CURO to file a Registration Statement on Form S-1 with the SEC for the Secondary Offering. The S-1 was signed by defendants Gayhardt, Rippel, Faulkner, McKnight, Masto, Winterhof, Frawley, and Williams. On May 16, 2018, the SEC declared the Registration Statement effective, and on May 17, 2018, CURO

conducted the Secondary Offering, which generated $109,250,000 in total proceeds for the selling stockholders. The Company received no proceeds from the Secondary Offering.

67.     The Individual Defendants were motivated to misrepresent and conceal CURO's true financial condition in order to facilitate and maximize the proceeds to defendants Faulkner and McKnight and the FFL Defendants, who collectively sold 3,497,411 shares at $23.00 per share (before Underwriters costs and fees), which generated proceeds of approximately $76 million. Defendants Faulkner and McKnight reaped approximately $11 million each from their stock sales in the Secondary Offering.

68.     The Secondary Offering terms would have been far less favorable to defendants Faulkner and McKnight and the FFL Defendants had the market known the truth about the Individual Defendants' decision to rapidly complete the transition from single-pay to open-end loans in Ontario, which was hurting the Company's financial condition and had already made the Company's FY18 guidance unattainable. Thus, the Individual Defendants, who were admittedly controlled by the Founder Defendants and the FFL Defendants, permitted the Secondary Offering to occur (and indeed, facilitated it) even though they knew that material, negative information regarding the Company's current and future business prospects was not disclosed to stockholders.

**E.     CURO Transitions to Open-End Loans in Ontario, but the Individual Defendants Conceal the Negative Financial Impact of the Transition**

69.     In May 2018, the Individual Defendants significantly accelerated the Company's transition from single-pay to open-end loans in Ontario. Under the Individual Defendants' direction, the Company sought to convert existing single-pay customers into open-end loan products at the Company's remaining 107 branches in Ontario and also targeted new customers. Rather than moderate the transition away from single-pay loans over the "next couple of years," as defendant Gayhardt had previously stated, the Company rapidly completed the majority of the

transition just months later, by July 2018. This led to a predictable, negative impact to CURO's 3Q18 operations and financial results, and the Company's ability to meet its FY18 guidance.

70.     As part of the Individual Defendants' strategy to rapidly complete the transition to open-end loans in Ontario, the Company began a massive advertising campaign through direct mailing, cable TV, and other mediums. The Company's marketing campaign was a success, as stockholders would later be told that CURO converted nearly 40,000 single-pay customers to open-end loans by the end of 3Q18. Because CURO had primarily targeted existing single-pay customers, the CURO Platform provided the Individual Defendants with detailed data about those customers, including information about originations, payments, defaults, and payoffs. The Individual Defendants therefore knew or recklessly disregarded that open-end customers were taking out larger loans (at lower interest rates), resulting in larger loan balances and higher up-front provisions, which had a corresponding negative impact on CURO's operations and financial results.

71.     Although the Individual Defendants could have moderated the flow of customers from single-pay to open-end loans, thereby reducing the increase in loan loss provisions and the decrease in single-pay revenue, they made the choice not to do so even though they knew that the rapid transition to open-end loans in Ontario came with significant operational risks (risks that later materialized). Moreover, instead of being honest and up front with stockholders about these risks and the trade-offs from making a faster transition from single-pay to open-end, the Individual Defendants chose to conceal this information from stockholders. When announcing the Company's 2Q18 earnings results on July 30, 2018, after CURO had substantially completed the transition to open-end loans and after the "majority" of the losses stemming from the transition had already occurred, the Individual Defendants continued to tout their "confidence" in the

Company's FY18 guidance and downplayed any impact to the Company's financial results or guidance as a result of the transition.

72.   For example, during the Company's 2Q18 earnings conference call on July 31, 2018, the Individual Defendants provided an update on the "early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a[n] [open-end] line of credit that's been very well received by our customers." During the July 31, 2018 call, the Individual Defendants also disclosed for the first time that the Company had moved up the transition to open-end loans in Ontario from 2019 to 2018, but did not disclose the truth: that the "majority" of the transition and the associated losses had already occurred.

73.   The Individual Defendants also gave stockholders the false impression that any negative impact resulting from the transition had occurred in the just reported 2Q18, but would normalize in the second half of the year. Specifically, during the July 31, 2018 earnings conference call, the Individual Defendants explained that the transition in Ontario could result in "lower revenue while the book builds and higher provision when larger balance dollars are originated," but also indicated that the "higher provision" from the Company's transition had occurred in 2Q18, reporting "diluted earnings for [2Q18]" and explaining that CURO could have had "better earnings [in 2Q18] had we taken a more incremental approach", but that our provision in the second half of the year would run about with revenue," and "the provisioning should be in line with revenue."

74.   Further, although the Company cautioned that the transition could "impact earnings for the full year versus our plan" and that the ongoing Canadian transition was "too fluid" to completely discount a bit of downside risk, the Company nevertheless affirmed its previously announced FY18 guidance. In fact, defendant Gayhardt told investors he had a "very high degree of confidence in achieving" full year guidance and that there was "a good likelihood that we'll come out ahead on our internal forecasts and our published guidance."

75.     At the time of the Individual Defendants' statements on July 30 and 31, 2018, the Company had already completed the majority of the transition to open-end loans in Ontario, which had a material, negative impact on the Company's operations, "dramatically" reduced Canadian single-pay revenues, and meant that the Company would not be able to maintain or meet the FY18 guidance stockholders had been told the Company had a "very high degree of confidence in achieving."

76.     Due to the information provided by the CURO Platform, the Individual Defendants knew and concealed from stockholders: (i) that the Company's rapid transition to open-end loans in Ontario had resulted in more loans with larger loan balances and, in turn, higher up-front provisioning; (ii) the Company's advertising costs had skyrocketed as the Company spent more money marketing its open-end loan products to existing single-pay customers and new customers; and (iii) the transition to open-end loans had cannibalized single-pay revenue rendering CURO's FY18 guidance unachievable.

F.     **The Individual Defendants Cause CURO to Complete a $690 Million Senior Secured Notes Offering**

77.     On August 6, 2018, the Individual Defendants caused CURO to announce that the Company intended to offer $675 million aggregate principal amount of its senior secured notes due 2025 in a private placement (the "Notes Offering"). On August 13, 2018, the Company announced that it had upsized the Notes Offering from $675 million to $690 million aggregate principal amount and disclosed that the senior secured notes, due 2025, would be priced at 8.25%. The Company also disclosed that it intended to use the net proceeds from the sale: (i) to redeem the outstanding 12% senior secured notes due 2022 of the Company's wholly owned subsidiary; (ii) to repay the outstanding indebtedness under the Company's wholly owned subsidiary, five-

year revolving credit facility; (iii) for general corporate purposes; and (iv) to pay fees, expenses, premiums, and accrued interest in connection therewith.

**G.    The Individual Defendants Repeatedly Confirm the Importance of CURO's Canadian Operations**

78.    Ontario was the Company's largest Canadian region, comprising two-thirds of the Company's Canadian revenues and nearly 13% of CURO's total consolidated revenues as of December 31, 2017. The Individual Defendants knew that tightening regulations in Canada had the potential to materially impact CURO's operations and financial results. As such, the Individual Defendants closely monitored changing regulations in Canada (and Ontario specifically), and discussed the Canadian regulatory environment in the Company's press releases and SEC filings. The Individual Defendants also spoke about the Canadian regulatory environment during their prepared remarks on every quarterly earnings call throughout the Relevant Period, and were asked and answered detailed questions by analysts about the topic.

79.    For example, in CURO's Form 10-K, filed with the SEC on March 13, 2018 ("2017 10-K"), the Individual Defendants dedicated three pages to a discussion about "Canadian Regulations" and specifically discussed the new regulations in Ontario effective January 1 and July 1, 2018. During the April 27 and July 31, 2018 earnings conference calls, defendant Gayhardt discussed the new regulations in Ontario and told stockholders that the Company had "anticipated these changes." The Individual Defendants' repeated references to the Canadian regulations leading up to and throughout the Relevant Period supports the reasonable inference that the Individual Defendants closely monitored the regulatory changes in Canada and were also closely monitoring any actual or potential impact to CURO's operations as a result.

80.    This reasonable inference is bolstered by the fact that CURO's Canadian single-pay loans were historically the Company's "most profitable single line of business," generating

yields of almost 400% in the years leading up to the Relevant Period. As Alberta, Ontario and British Columbia enacted regulations which lowered the rates CURO could charge on single-pay loans, the yields on those loans declined dramatically and were hovering around 250% by 1Q18 (down from upwards of 400% in prior periods). In fact, during the Stephens Fall Investment Conference (the "Stephens Conference"), the Individual Defendants admitted that increasing regulations prompted the Individual Defendants to make a "real decision" regarding the profitability of single-pay loans in Ontario, Canada, which prompted the transition to open-end loans.

81.     Given the importance of single-pay loans in Ontario to the Company's overall operations and financial condition, and the Individual Defendants' statements during the Stephens Conference, it is reasonable to infer that the Individual Defendants were closely involved in the decision to rapidly complete the transition to open-end loans and, therefore, knew or recklessly disregarded that the Company's operations and financial results would experience a negative, short-term impact as CURO quickly transitioned away from its most profitable, high-yield product to lower yield, open-end loans.

H.     **The Individual Defendants Had Substantial Experience and The Benefit of The Alberta, Canada Test Markets Which Buttress the Inference of Knowledge on Their Behalf**

82.     The Individual Defendants' own Relevant Period statements confirm that they knew that the transition from single-pay loans to open-end loans would be received favorably by customers in Ontario, which would result in more open-end loans with larger loan balances and, in turn, higher up-front provisioning (i.e., larger non-cash charge offs). First, the rapid transition in Ontario in 3Q18 was timed to coincide with what was seasonally a quarter of increased demand in Canada. As the Individual Defendants noted in the Company's 2017 10-K, historically CURO "typically experience[d]" its "highest demand in Canada in the third and fourth calendar quarters."

83.     Second, the Individual Defendants had years of experience with open-end loans and multiple months of data (from the Alberta test market) demonstrating Canadian consumers' preference for such loans. This is not only reasonable, but logical – what borrower wouldn't prefer a lower interest rate with increased repayment flexibility? During the Stephens Conference, the Individual Defendants explained that the Company had been "operating a line of credit for 11 years" stating, we "know how to do" open-end loans, as CURO had been offering open-end loans in the U.S. for the previous five years. Accordingly, the Individual Defendants had substantial experience with the performance of open-end loans from which to draw from, and this experience would have informed their expectations for the performance of open-end loans in Canada.

84.     Additionally, since 4Q17, the Individual Defendants had been closely monitoring the conversion to open-end loans in Canada, beginning first in the Alberta test market. As a result of the transition in Alberta, the Individual Defendants "had a lot of experience in the data" CURO collected from its customers there before the Company "pulled the trigger on Ontario." CURO had also launched open-end test stores in Windsor, Ontario during this time, which also provided data relevant to the single-pay vs. open-end loan transition. The Individual Defendants closely tracked the performance and results of these test stores and markets, monitoring metrics like acquisition costs, credit performance, foot traffic, take-up rates, first-pay defaults, line utilization, adjusted EBITDA margins, revenue per store, and provision for losses.

85.     The Windsor, Ontario test stores had "incredibly favorable" results with positive "take-up rates," good "conversion rates" from existing customers, and a "healthy number of new customers." Senior Company officers would later admit during the Stephens Conference that the Individual Defendants had "five months of seasoning in [the open-end loan] universe in Ontario" before they decided to rapidly complete the majority of the transition from single-pay to open-end loans July 2018.

86.    During the transition in Ontario, the Individual Defendants focused primarily on converting existing single-pay customers to open-end loans and, as a result, had access to ***pre-existing***, detailed customer data via the CURO Platform, including prior payment history, which the Individual Defendants described as "the most predictive element" in gauging loan performance. According to the Company's records, CURO converted 38,000 existing single-pay customers to open-end loans in 3Q18 alone.

87.    Third, because CURO's target customer base is highly vulnerable – nonprime, unbanked, or underbanked consumers with an immediate need for cash or who otherwise fail to qualify for traditional banking services – it is a reasonable inference that the Individual Defendants were aware that CURO's single-pay customers would jump at the opportunity to have access to more cash (particularly on more favorable interest rate and repayment terms), resulting in larger open-end loan balances and increased up-front provisioning. The numbers bear this out. CURO's average single-pay loan was approximately $600, while the average line of credit was approximately $2,400, with the average amount drawn of around $1,800, or three times the size of the average payday loan.  And, unlike payday loans, which require a new application and loan when additional cash is needed, customers taking out a line of credit only have to apply once and, if approved, can request cash advances as often as they need up to the available credit limit.  Based on these facts, it is reasonable to infer that the Individual Defendants knew or recklessly disregarded that the Company would experience a sudden increase in the amount of open-end loans when it rapidly completed the transition to open-end loans in Ontario in 3Q18.

88.    Fourth, the Individual Defendants also knew or recklessly disregarded that as they made the decision to accelerate the timing of transitioning single-pay loans to open-end loans in Ontario, the Company's loss provisions would increase concomitantly with the increase in open-end loan balances. This inference is buttressed by the fact that the Individual Defendants were well

aware that the Company was required to take an upfront provision on the open-end loans it originated, as this loan loss provision metric was closely monitored and reported both Company-wide and Canadian segment-specific loan loss provisions to stockholders as a performance metric in the Company's Relevant Period SEC filings and press releases. The Individual Defendants also discussed loan loss provisions on quarterly conference calls throughout the Relevant Period, both in their prepared remarks and in response to analyst inquiries.

89.     Fifth, the Individual Defendants also knew or recklessly disregarded that the Company's aggressive multi-channel marketing plan, which was finalized at the end of June 2018, would result in more customers taking out open-end loans and cause an increase in the corresponding up-front provisioning as well as increased advertising costs. This would necessarily have a further negative impact on the Company's financials. This reasonable inference is further confirmed by defendant Gayhardt's own statements, wherein he said: "if you live in Ontario . . . unless you're kind of living in a cave, we think we've reached you *multiple times with this advertising*." The cost of the Company's marketing strategy was reflected in its 3Q18 results, which reported a 37% increase in advertising costs from the prior quarter due to "acquiring more installment and open-end customers versus single-pay," expanding "cable TV and direct mail spend and other media spend, especially in July" when the Company "introduced open-end in Ontario," and "new product expansion, including our LendDirect stores."

90.     Each of these allegations support the reasonable inference that the Individual Defendants knew CURO's transition from single-pay to open-end loans would have a materially negative effect on CURO's financial results. Similarly, the failure by the Individual Defendants to honestly and accurately report this information to stockholders is relevant, not just to the claims alleged against the Individual Defendants, but also to the demand futility inquiry with respect to the current members of the Board, which is discussed below.

## VI.    INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

### A.    First Quarter 2018 Financial Results

91.    On April 26, 2018, the Individual Defendants caused CURO to issue a press release announcing the Company's financial results for the quarter ended March 31, 2018 and affirmed the Company's FY18 guidance ("1Q18 Press Release"). The 1Q18 Press Release stated:

> Fiscal 2018 Outlook
>
> The Company affirms its full-year 2018 adjusted earnings guidance, a non-GAAP measure that excludes the $11.7 million of debt extinguishment costs from the retirement of $77.5 million of the 12.00% Senior Secured Notes due 2022 and stock-based compensation, as follows:
>
> - Revenue in the range of $1.025 billion to $1.080 billion
>
> - Net Income in the range of $110 million to $116 million
>
> - Adjusted EBITDA in the range of $245 million to $255 million
>
> - Estimated tax rate of 25% to 27% for the full year
>
> - Adjusted Diluted Earnings per Share of $2.25 to $2.40

92.    The 1Q18 Press Release also discussed the Canadian regulatory changes and compared the Company's 1Q18 results to the previous year's financial results, noting declining single-pay revenue and increasing open-end loan balances as a result of the Company's intentional "product shift" from single-pay to installment and open-end loans:

> Single-Pay revenues were flat year-over year. The effect of Single-Pay receivables growth was offset by regulatory changes in Ontario, Canada. Open-End revenues rose 52.0% on organic growth in the U.S. and the introduction of Open-End products in Virginia and Canada.
>
> * * *
>
> Open-End loan balances increased by $25.9 million compared to March 31, 2017 from year-over-year growth in Kansas and Tennessee of 12.2% and 8.6%, respectively, the 2017 launch of Open-End in Virginia and conversion in the fourth quarter of 2017 of a portion of Canada Unsecured Installment loans to Open-End loans. The provision for losses and Open-End Allowance for loan losses as a

percentage of Open- End gross loans receivable remained consistent with the previous quarter.

* * *

Single-Pay revenue and combined loans receivable during the three months ended March 31, 2018 were affected primarily by regulatory changes in Canada (rate changes in Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.

93.    Comparing the Company's 1Q18 Canadian segment results to the same period in 2017, the 1Q18 Press Release stated:

Revenue in Canada was impacted by the product transition in Alberta from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia. Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period. On a constant currency basis, revenue was up $2.6 million, or 6.3%.

* * *

The provision for losses increased $2.3 million or 22.7% to $12.6 million for the three months ended March 31, 2018 compared to $10.2 million in the prior year period, primarily due to relative loan volumes and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $1.8 million, or 17.2%.

* * *

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, due to . . . expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans.

94.    Before the market opened on April 27, 2018, the Individual Defendants hosted a conference call with analysts and stockholders to discuss the Company's operations and 1Q18 financial results. During the call, defendants Gayhardt, Dean and Baker spoke positively about the Company's financial results and operations and the Canadian product transition. For example, in his prepared remarks, defendant Gayhardt credited the Company's transition out of single-pay products as one of the "key drivers" of the Company's "growth" and stated:

> Current 4 key drivers for this growth: First is the continued mix shift in our products to install the (inaudible) lines of credit, which, together, accounted for 71.4% of our total revenue, up from 57.2% in the prior year quarter. . . .

95.     Defendant Gayhardt also discussed the "anticipated" regulatory changes and their impact on Ontario's single-pay business, and assured the market of the ongoing "viability" of Ontario's single-pay product:

> In Canada, new rules came into effect in Ontario and lowered the maximum rate from $18 per $100 lent to $15 per $100 lent effective January 1 of this year. And we're working to incorporate a new extended payment plan and an ability to repay guideline for release on July 1. We had anticipated these changes and believe that Single-Pay lending remains viable in Ontario, although we will continue to expand our Installment and Open-End offerings in Ontario and other provinces.

96.     Defendant Gayhardt concluded his prepared remarks by stating, "***we're very happy to affirm the guidance we gave you in January***" and assured investors that "***I'm relatively certain we have a much higher degree of confidence in delivering on those numbers, and we look forward to discussing guidance in more detail after our June quarter***."

97.     Defendant Dean also reiterated that the Company was "affirming full year 2018 adjusted earnings guidance" and noted that the Company "continue[d] to anticipate revenue in the range of $1.025 billion to $1.080 billion and with continued solid growth in the U.S. and U.K. being offset partially by declines in Canada from the additional regulatory changes in the middle of the year." Defendant Dean further "affirm[ed] adjusted EBITDA in the range of $245 million to $255 million, adjusted net income in the range of $110 million to $116 million and adjusted diluted earnings per share in the range of . . . $2.25 to $2.40."

98.     Defendant Gayhardt also explicitly told stockholders that any upfront provisioning resulting from the Canadian transition from single-pay to open-end was already "anticipated" and factored into the Company's "2018 forecast" and "guidance," stating:

> Canada, as you mentioned, we are seeing much more pronounced kind of mix shift from Single-Pay to Installment. We went through that in Alberta. We're growing the LendDirect business in the stores, [went] online in Ontario, which is about 2/3

of our overall Canadian business. ***You'll start to see more of that as well, so there'll be some of that provisioning, but I think we're -- we had anticipated that and when we developed our forecast and our guidance, we -- there's nothing really going on in terms of mix shift or the overall kind of growth trends, it's that it's out of line with our forecast***.

99.     As the call continued, when asked about "targets" for the Company's "mix-shift," defendant Gayhardt assured stockholders that the transition out of single-pay products in Canada would not be rapid or immediate, but, instead, would occur over the "next couple years," stating:

So Canada is 13%, Canada Single-Pay is 13% of total revenue, that's down from 15% last year. I suspect you'll see that Canada number probably cut in half over the next couple of years and maybe even go lower than that depending on how -- what the take-up rate and success rate of our line of credit product is there. . . .

And Canada, I suspect that 13% will be cut in half over the next couple of years as well. So you could see 23% between Canada and U.S. Single-Pay revenue. I think you could see that number go, that combined number go below 10% in the next couple of years.

100.     On May 3, 2018, the Individual Defendants caused CURO to file its Form 10-Q ("1Q18 10-Q") with the SEC, which confirmed the Company's previously announced financial results and financial position. The 1Q18 10-Q also represented that management's disclosures, controls, and procedures were effective: "Based on an evaluation of our disclosure controls and procedures as of the end of the period covered by this report conducted by our management, with the participation of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief Financial Officer concluded that these controls and procedures were effective as of March 31, 2018".

101.     The 1Q18 10-Q discussed the Canada segment specifically, and stated:

Revenue in Canada was impacted by the product transition in Alberta from Single-Pay to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Ontario and British Columbia. Canada revenue improved $4.7 million, or 11.3% to $46.3 million for the three months ended March 31, 2018 from $41.6 million in the prior year period. On a constant currency basis, revenue was up $2.6 million, or 6.3%.

* * *

36

The provision for losses increased $2.3 million, or 22.7% to $12.6 million in the three months ended March 31, 2018 from $10.2 million in the prior year period, primarily due to relative loan volumes and the mix shift from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $1.8 million, or 17.2%.

* * *

Operating expenses increased $1.6 million, or 45.5%, to $5.0 million in the three months ended March 31, 2018, from $3.4 million in the prior year period, due to increased collections and customer support payroll expenses from seasonality, increased volumes, expansion of the LendDirect business, and product shifts from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, operating expenses increased $1.3 million, or 39.2%.

102.    On May 14, 2018, the Individual Defendants caused CURO to file a Registration Statement on Form S-1 with the SEC for the Secondary Offering, and on May 17, 2018, caused CURO to file its prospectus (together, the "Secondary Offering Documents"). The Secondary Offering Documents incorporated by reference the the Company's 1Q18 Press Release and 1Q18 10-Q, which (i) misrepresented and concealed the true, negative impact that the transition from single-pay to installment and open-end loans in Canada would have on CURO's financial results; (ii) failed to disclose that the transition to open-end loans would come at the expense of the Canadian single-pay revenue; (iii) single-pay revenue was being cannibalized by open-end loans during the transition; and (iv) instead of being cut in half over "a couple of years," Canadian single-pay revenue would be dramatically reduced, dropping 50%, from approximately 16% of the Company's total revenue in 3Q17 to only 8% of the Company's total revenue by the end of 3Q18; and (v) the Company's disclosure controls were not operating effectively.

**B.    Second Quarter 2018 Financial Results**

103.    On July 30, 2018, the Individual Defendants caused CURO to issue a press release announcing its financial results for the quarter ended June 30, 2018 (the "2Q18 Press Release"). In the 2Q18 Press Release, defendant Gayhardt reiterated his "confidence" that CURO would meet its "full year guidance," stating:

> We are pleased to announce year-over-year loan growth of 26.9% and sequential loan growth of 14.1%, adjusted earnings growth in the first half of 2018 of 18.9%, and the execution of a milestone bank partner agreement that allows us to expand our lending footprint in the U.S. Our momentum, improvement in credit metrics and solid loan growth has further bolstered our confidence in our full year earnings guidance.

104.   The 2Q18 Press Release "affirm[ed]" the Company's 2018 guidance for adjusted net income, adjusted EBITDA, and adjusted diluted EPS, and again highlighted the Company's "confidence" in meeting guidance objectives but failed to disclose material facts concerning the Company's transition from single-pay to installment and open-end loans in Canada, assuring the market that any "accelerated open-end growth" was having a minimal impact on the Company's single-pay balances.

105.   Before the market opened on July 31, 2018, the Individual Defendants hosted a conference call with analysts and stockholders to discuss the Company's operations and 2Q18 financial results. During the call, defendants Gayhardt, Dean and Baker spoke positively about the Company's financial results and the Canadian product transition. Defendant Gayhardt discussed the Company's quarter from an "operational standpoint" and highlighted the "successful introduction" of the transition in Ontario, and stated:

> We made great progress on. . . the early stage of a very successful introduction transition of a big part of our Ontario lending business of the legacy single-pay loan product to a line of credit that's been very well-received by our customers.
>
> We'll unpack the Ontario transition in some detail later on, but it's a big undertaking that's going very well and is running well ahead of schedule. We did all this while maintaining our credit and other financial disciplines. These are big projects that require many people from many departments to work together, and we're incredibly proud of all of our CURO team members for giving this a huge effort this quarter.

106.   Defendant Gayhardt stated that the Canadian product transition was "too fluid" to "completely discount a bit of downside risk" on the Company's FY18 guidance, but nevertheless tempered investor concerns about any negative impact to the Company's financial position by re-

affirming the Company's FY18 guidance. Specifically, defendant Gayhardt highlighted the Company's "high degree of confidence" in achieving guidance, even going so far as to tell investors that there was a "good likelihood" that the Company would **beat** guidance estimates:

> We are affirming our guidance today . . . we have a very high degree of confidence in achieving our guidance objections. And, obviously, today we're about 60% of the way through the year, so that certainly helps. And our confidence in our core business and products is very high. It's probably just that the Canadian product transition and the U.K. affordability issue are both too fluid for us to completely discount a bit of downside risk on both those fronts.

> So looking at our current forecast, we expect our Canadian and U.K. operations to fall short of our operating earnings plan for the full year 2018 in the range of $10 million -- that's U.S. $10 million. So sitting here today, we do think, as I just mentioned, the U.S. business will be able to make -- to more than make up for these projected international shortfalls, and we believe that there's a good likelihood that we'll come out ahead on our internal forecasts and our published guidance.

107.    Defendant Gayhardt also informed stockholders that CURO had "moved up" the introduction of the transition in Ontario from 2019 to 2Q18, but concealed that the transition had already occurred, instead of the Company moderating the transition over several years as he had previously stated would occur. Specifically, Gayhardt stated:

> First, in Canada, as I mentioned earlier, ongoing changes in the provincial regulation of single-pay lending in Canada, coupled with our growing competencies in marketing, underwriting and servicing line of credit products, brought us to the **decision to accelerate the transition of our product offerings, particularly in Ontario, which accounts for about 2/3 of our Canadian revenue.**

> Although we anticipated introducing a line of credit product in our Ontario locations during 2019, early test results we initiated in February of this year were incredibly favorable in terms of acquisition costs, credit performance, take-up rates, line utilization, and really the whole deal, so we moved up our -- we simply moved up our conversions schedule.

> * * *

> **So what does that mean?  It means higher earning asset balances in our line of credit portfolio in Canada than previously forecasted, but lower yields and lower revenue while the book builds and higher provision when larger balance dollars are originated**.

We started the quarter with just over $53 million in non-single-pay – these are all U.S. dollars, by the way. We started the quarter with just over $53 million in non-single-pay balances, and we ended the quarter with $74.7 million, and having booked the kind of larger marketing and convergence plan in late June, the balances today sit at over $115 million, so great growth, all driven by tremendous customer communication and service by our store and call center teams in Canada.

108.    On August 2, 2018, the Individual Defendants caused CURO to file its Form 10-Q ("2Q18 10-Q") with the SEC, which stated in relevant part, the following:

> ***Single-Pay revenues were affected primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) and continued product shift from Single-Pay to Installment and Open-End loans in all countries.*** Open-End revenues rose 72.2% on organic growth in the U.S. and the introduction of Open-End products in Virginia and Canada. Open-End adoption in Canada accelerated this quarter as related loan balances grew $34.3 million sequentially from the first quarter. Even with the accelerated Open-End growth, Single-Pay balances in Canada only shrank sequentially by $1.4 million.
>
> * * *
>
> Canada revenue improved $3.4 million, or 7.9%, to $47.0 million for the three months ended June 30, 2018 from $43.6 million in the prior year period. On a constant currency basis, revenue was up $1.6 million, or 3.6%. Revenue growth in Canada was impacted by the product transition from Single-Pay loans to Unsecured Installment and Open-End loans and the impact of regulatory rate changes in Alberta, Ontario and British Columbia.
>
> Single-Pay revenue decreased $1.6 million, or 4.6%, to $33.3 million for the three months ended June 30, 2018 and Single-Pay ending receivables decreased $1.1 million, or 2.2%, to $47.3 million from $48.4 million in the prior year period due to mix shift in Ontario where we launched Open-End loans in the fourth quarter of 2017.
>
> Canadian non-Single-Pay revenue increased $5.0 million, or 58.4%, to $13.7 million compared to $8.6 million the same quarter a year ago on $31.9 million, or 74.5%, growth in related loan balances. The increase was primarily related to the launch of Open-End products in Alberta and Ontario in the fourth quarter of 2017.
>
> The provision for losses increased $4.1 million, or 39.4%, to $14.4 million for the three months ended June 30, 2018 compared to $10.3 million in the prior year period, because of upfront provisioning on relative loan volumes (total Open-End and Installment loans grew sequentially by $20.9 million this second quarter compared to $10.9 million in the second quarter of 2017), and mix shift from Single-Pay loans to Unsecured Installment and Open-End loans. On a constant currency basis, provision for losses increased $3.5 million, or 33.7%.

## VII.   THE TRUTH IS REVEALED

109.   On October 24, 2018, the Individual Defendants caused CURO to report its financial results for 3Q18. The Company reported revenue of $283 million, adjusted diluted EPS of $0.23, and a year-over-year earnings decline "primarily due to required up-front provisioning." In the accompanying press release, defendant Gayhardt revealed that the Company's results were "particularly affected by the acceleration of Open-End loan product in Canada" and "[t]he related upfront loan loss provisioning," which caused Canadian "net revenue and Adjusted EBITDA to drop by $10.9 million and $13.2 million sequentially." Canadian revenue also declined 8.8% year-over-year "primarily due to the continued product mix shift from Single-Pay," which was affected "primarily by regulatory changes in Canada (rate changes in Alberta, Ontario and British Columbia) leading to a shift to Open-End loans as well as a continued general product shift from Single-Pay to Installment and Open-End loans in all countries."

110.   Despite the Individual Defendants' representations just three months earlier that they had "a very high degree of confidence" in achieving, and even surpassing, FY18 guidance, the Company significantly cut its adjusted EPS guidance for 2018 to $1.84 to $1.88, down from $2.25 to $2.40, lowered adjusted net income guidance to $88 million to $91 million, down from $110 million to $116 million, and cut adjusted EBITDA guidance to $215 million to $218 million, down from $245 million to $255 million.

111.   On October 25, 2018, the Individual Defendants hosted an earnings conference call to discuss the Company's 3Q18 results. Defendant Gayhardt opened the conference call by "acknowledg[ing] that this quarter fell short of our expectations, and probably your expectations, and quite simply, is not up to our standards."  He disclosed that nearly the entirety of the operating earnings shortfall related to the Company's "ongoing Canadian product migration and increased loan loss provision related to higher-than-expected loan growth," confirmed that "[b]y far the

biggest impact to quarterly results was the ongoing product migration in Canada, specifically in the province of Ontario," and revealed that the Company was "dramatically reducing [its] Canadian Single-Pay revenue." Defendant Gayhardt also confirmed that "we completed the transition to [open-end] in Ontario and Alberta."  In contrast to the Individual Defendants' prior representations that the loss provision in the second half of the year would run "about even" with revenue, the Company reported "loan loss as a percentage of revenue at 52.9%." Defendant Gayhardt reiterated that a "significant part" of the reduction in 2018 EPS guidance "relates to the allowance builds for line of credit product," i.e., the up-front provisioning required for open-end loans.

112.    Defendant Gayhardt essentially admitted that the Individual Defendants knew the Company's FY18 guidance was unachievable at the time they reaffirmed it on April 27 and July 31, 2018 as a result of the transition from single-pay to open-end loans in Canada and specifically Ontario, stating: "we did a less than stellar job of explaining in our – probably our July call or even back into our April call . . . the impact of this . . . in the near term . . . we probably didn't lay it out for everybody as explicitly as we probably should have. And we'll try not to make that mistake again." Defendant Dean also confirmed that the "majority" of the loss for 3Q18 "came in July."

113.    In response to these revelations, CURO's stock fell 34%, or $7.69, falling from $22.87 per share on October 24, 2018 to a close of $15.18 on October 25, 2018.

### A.    Defendant Gayhardt Confirms the Individual Defendants Misled Stockholders

114.     On November 8, 2018, defendants Gayhardt, Dean and Baker presented at the Stephens Conference, during which they provided additional details about CURO's transition to open-end loans in Ontario. Defendant Gayhardt confirmed that the Individual Defendants chose to accelerate the transition from single-pay to open-end loans in Ontario from 2019 to 2018 in 1Q18

and that they intentionally chose not to moderate the speed of the transition even though they could have done so. Gayhardt also confirmed that the bulk of the Ontario transition occurred in "May . . . June in honest," i.e., months before the Individual Defendants' statements on July 30 and 31, 2018.

115.    On January 31, 2019, the Individual Defendants caused CURO to reported the Company's financial results for the fourth quarter 2018 ("4Q18") and the year-ended December 31, 2018, disclosing that revenue from single-pay loans in Canada comprised only 7% of the Company's total revenue for 4Q18, compared to 14.6% for the same time period in 2017. For the year, single-pay loans had dropped to 10% of the Company's total revenue in 2018, down from 15% the prior year.

116.    On March 18, 2019, the Individual Defendants caused CURO to file its Form 10-K for the fiscal year ended December 31, 2018 ("2018 10-K"). The 2018 10-K admits that the accelerated shift to open-end loans in Canada "came at the expense of single-pay loan balances" and that CURO's "disclosure controls and procedures were not effective" as of December 31, 2018.

117.    On May 6, 2019, the Individual Defendants caused CURO to file its 1Q19 10-Q, which disclosed that the Company had "received an inquiry from the SEC regarding the Company's public disclosures surrounding its efforts to transition the Canadian inventory of products from Single-Pay loans to Open-End loans."

## VIII.   THE SECURITIES ACTION

118.    Based on these events, in 2018, a securities fraud class action captioned *Yellowdog Partners, LP v. CURO Group Holdings Corp., et al*., Civil Action No. 2:18-cv-02662-JWL-KGG (the "Securities Action") was filed in the United States District Court for the District of Kansas on behalf of investors who purchased CURO stock during the "Class Period" (defined between April

27, 2018 and October 24, 2018, inclusive). The consolidated complaint in the Securities Action names CURO, defendants Gayhardt, Rippel, Faulkner, McKnight and the FFL Defendants, in addition to other CURO officers.

119.    On December 3, 2019, the motion to dismiss the Securities Action, filed by CURO and the other defendants was denied in full. In other words, the District of Kansas concluded, based on the allegations set forth in the operative complaint, that there was *indicia* that defendants Gayhardt, Rippel, Faulkner, McKnight and the FFL Defendants participated in a scheme to defraud CURO investors during the entirety of the Class Period. In sustaining the Securities Action, the Court held the following:

> Specifically, plaintiffs allege that defendants effectively admitted that they did a poor job explaining the near-term negative impact of the transition; that they decided to accelerate the transition to complete it in the second and third quarters of 2018, with that transition begun by June 2018; that most of the resulting losses occurred in July 2018 prior to the reaffirmance of the 2018 guidance at the end of that month; that the impact could have been lessened if the transition had occurred over a longer period, but that they decided against installing any such "speed bumps"; and that their disclosure controls were not effective. Defendants argue that they did not in those statements admit to committing fraud or to making knowingly false statements. Defendants have not argued or shown, however, that their post-period statements are not relevant. ***The Court agrees with plaintiffs that these facts do support an inference that defendants were at least reckless in failing to disclose that the decision to accelerate the transition would call into question the accuracy of the 2018 guidance.***
>
> * * *
>
> ***Plaintiffs thus do not rely on one or two facts in alleging scienter, but rather have alleged a number of facts that support an inference of scienter for different reasons.*** Defendants have attempted to attack those facts individually, but they have not persuaded the Court that the allegations, considered in their totality, are insufficient.
>
> * * *
>
> Plaintiffs argue that the importance of that business creates an inference that defendants would have been closely monitoring that impact and thus would have appreciated the true short-term financial effect of the transition (thus supporting an inference of scienter)... ***The Court agrees with plaintiffs that the importance of***

**this business does support an inference that defendants closely monitored the transition and its effects, and thus supports an inference of scienter here.**

\* \* \*

Plaintiffs allege that defendants knew that the transition away from single-pay loans in Ontario would be successful (and thus would negatively impact short-term performance) based on the following facts: the transition coincided with a traditional time of increased demand; data showed a preference for open- end loans; defendants gained experience and data from the test transitions in Alberta and one market in Ontario; the company had data on the targeted customers; the transition targeted a particularly vulnerable demographic; defendants knew that the transition would affect loan loss provisioning; and the company aggressively marketed the transition. Defendants call such allegations speculative and note that plaintiffs did not include detailed allegations concerning the data that defendants received. **Nevertheless, defendants have not provided any basis to ignore these allegations, which do support plaintiffs' argument in favor of scienter.**

120.     Judge Lungstrum of the District of Kansas concluded by saying the following in finding scienter against all defendants: "Plaintiffs thus do not rely on one or two facts in alleging scienter, but rather have alleged a number of facts that support an inference of scienter for different reasons. Defendants have attempted to attack those facts individually, but they have not persuaded the Court that the allegations, considered in their totality, are insufficient."

## IX.   DAMAGES TO CURO

121.     CURO has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct alleged herein. As a direct and proximate result of the Individual Defendants' misconduct, CURO has expended and will continue to expend significant sums of money. Indeed, the Securities Action was sustained in its entirety in December 2019, and the Court's December 3, 2019, denial of the Company's motion to dismiss presages additional financial damages to CURO.

122.     Such expenditures include, but are not limited to: (a) legal fees associated with litigation against CURO and its officers and directors for violations of the federal securities laws, including the sustained Securities Action; (b) loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace; (c) amounts paid to outside lawyers, accountants, and investigators in connection with any investigation; and (d) loss of revenues and profits.

## X.      DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

123.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

124.     Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein and has been a shareholder of the Company during the Relevant Period.

125.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

126.     As a result of the factual allegations set forth herein, Plaintiff has not made any pre-suit demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because there is reason to doubt that a majority of the members of the Board are capable of making an independent and/or disinterested decision to institute and vigorously pursue this action.

127.     The Board currently consists of eleven (11) directors: defendants Rippel, Masto, Gayhardt, Faulkner, Frawley, Kirchheimer, McKnight, Williams and Winterhof (each of whom has served on the Board since at least April 2018) (for purposes of his section, these defendants are referred to as the "Director Defendants"), and non-parties Gillian Van Schaick and Elizabeth Webster (each of whom joined the Board subsequent to the allegations of the Individual Defendants' misconduct alleged herein).

128.     Under Delaware law, a derivative plaintiff need only demonstrate reason to doubt that a majority of the directors are disinterested or objective in order to establish pre-suit demand excusal. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that at least six (6) current directors of CURO are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

129.     First, As alleged in detail herein, the Board's decision to approve the Secondary Offering was not and could not have been the product of a good faith exercise of business judgment and is not protected by the business judgment rule, but rather is subject to the "entire fairness" standard, which the Director Defendants cannot possibly meet. Consequently, no demand on the Board is required.

130.     The Company's own public filings admit that CURO is controlled by the Founder Defendants (defendants Rippel, Masto and McKnight) and the FFL Defendants, and that they collectively had the ability to elect all of the members of CURO's Board and "thereby control[led] [CURO's] policies and operations, including the appointment of management." Accordingly, the Founder Defendants and the FFL Defendants exerted actual control over both CURO and the Board throughout the Relevant Period.

131.     As the Company's 2019 10-K explicitly states:

Friedman Fleischer & Lowe Capital Partners II, L.P. and its affiliated investment funds ("FFL Holders") and the original founders of the company ("Founder Holders") together own more than 50% of our common stock, and their interests may conflict with ours or yours in the future.

At December 31, 2019, FFL Holders and Founder Holders owned approximately 11.8% and 47.7%, respectively, of our outstanding common stock. As a result, the FFL Holders and the Founder Holders collectively have the ability to elect all of the members of our Board of Directors and thereby control our policies and operations, including the appointment of management…

132.     In addition, defendants Faulkner ($11 million) and McKnight ($11 million) and the FFL Defendants ($76 million) sold CURO stock in the Secondary Offering and personally

profited via the sale of such stock thereby. These defendants, therefore, reaped a personal financial benefit not shared by other stockholders which came at the detriment of CURO. Because the Founder Defendants controlled the Board, they possessed the power to demand the Board approve the Secondary Offering. Furthermore, they also had the power to require the remainder of the Board (defendants Gayhardt, Faulkner, Winterhof, Frawley and Williams) to sign the false and misleading S-1 in order to effectuate the sale of their stock via the Secondary Offering.

133.    Second, a majority (9 out of 11) of the Company's current directors -- defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof – are interested based on a substantial likelihood of liability in light of the admission by defendant Gayhardt during the October 25, 2018 earnings conference call, wherein defendant Gayhardt apologized to stockholders for doing a "less than stellar" job "explain[ing]" the "near term" negative impact of the transition during the Company's April 27 and July 31, 2018 conference calls. Defendant Gayhardt further admitted that despite reaffirming guidance on July 30 and July 31, 2018, the "majority" of the losses stemming from the Ontario transition (which caused the Company to alter its FY18 guidance) actually occurred in "July" of 2018, ***before*** the Individual Defendants reaffirmed guidance. Accordingly, the only reasonable inference to be drawn from the allegations set forth herein is that defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof either knew of and approved the issuance of public statements of false, unattainable guidance (in the 1Q18 and 2Q18 10-Qs and the S-1) and/or chose not to correct such false statements in a timely fashion, and/or consciously disregarded others' failure to correct such false statements in a timely fashion.

134.    Shareholders are entitled to honest and accurate communications from the Board. These nine directors knowingly permitted false information to be presented to

stockholders and thus demand is futile for each of defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof.

135.    Third, Not only was this a textbook violation of non-exculpable fiduciary duties of loyalty and good faith to the Company and its shareholders under Delaware law by defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof; it was also a violation of the Company's Ethics Code, which explicitly applies to all Board members. Among other things, pursuant to the Ethics Code, the Director Defendants were required to ensure that the Company's public SEC filings were "full, fair, accurate, timely and understandable". Clearly, defendants Faulkner, Frawley, Gayhardt, Kirchheimer, Masto, McKnight, Rippel, Williams and Winterhof breached their fiduciary duties under Delaware law and the duties imposed on them by the Ethics Code.

136.    Fourth, defendants Gayhardt, Rippel, Faulkner and McKnight are named as individual defendants in the Securities Action and securities fraud claims were sustained in their entirety at the motion to dismiss stage against each of them, therefore they each face a substantial likelihood of liability. The Kansas District Court's ruling came notwithstanding the materially heightened pleading standards applicable to the Securities Action pursuant to the PSLRA. Accordingly, it would be impossible under such circumstances for defendants Gayhardt, Rippel, Faulkner and McKnight to exercise disinterested and independent business judgment on the issue of whether CURO should prosecute this action.

137.    Fifth, the Board has admitted in the Company's public filings (most recently in CURO's Proxy Statement on Form DEF 14A) that defendant Gayhardt lacks independence based on his principal professional occupation as the Company's President and CEO. Accordingly, there is also reason to doubt defendant Gayhardt's independence.

138.     Sixth, the Board has admitted in the Company's public filings (most recently on the CURO's Proxy Statement on Form DEF 14A) that defendants Faulkner, McKnight and Rippel lack independence because they "previously served as officers of the Company". In addition, the Company also engaged in related party transactions with the Founder Defendants each year via real estate leases. The Founder Defendants co-own a separate company which leases CURO's corporate office, collection office and certain retail stores to CURO annually for $3.4 million. The leases have average terms of five years with two renewal options, each for five years. These agreements serve to further financial tie CURO to the Founder Defendants. Accordingly, there is also reason to doubt the independence of defendants Faulkner, McKnight and Rippel.

139.     Seventh, defendants Williams, Frawley and Kirchheimer also are interested for purposes of demand based on a substantial likelihood of liability in light of their conduct as members of the Audit Committee. Defendants Williams, Frawley and Kirchheimer, as members of the Audit Committee, were specifically duty-bound to assist the Board in monitoring, among other things, the integrity of the financial statements, reporting processes and internal controls of the Company. Defendants Williams, Frawley and Kirchheimer were additionally obligated to discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and to review the effectiveness of the Company's disclosure controls and procedures and internal controls. In sustaining the Securities Action, Judge Lungstrum concluded that the Company's 1Q18 and 2Q18 Form 10-Qs, as set forth above, were materially false and misleading and issued in connection with a scheme to defraud CURO investors. Thus, defendants Williams, Frawley and Kirchheimer and the Audit Committee, among other things, caused and/or permitted the Company to adopt ineffective internal controls over disclosure and financial reporting, which have rendered certain of the Company's

previously disseminated statements false and misleading. This theory is buttressed by the admission in CURO's 2018 10-K which disclosed that CURO's "disclosure controls and procedures were not effective" as of December 31, 2018. Defendants Williams, Frawley and Kirchheimer breached their non-exculpable fiduciary duties by violating their responsibilities under the Audit Committee Charter and now subjects each of them to a substantial likelihood of liability.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### For Breach of Fiduciary Duties
### Against All Individual Defendants

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

141.    As CURO's directors and top officers, the Individual Defendants owed CURO and its shareholders fiduciary duties of loyalty, candor and good faith – the highest duties known to the law. Rather than speak the entire truth when they said, or caused anything to be said, about the Company, the Individual Defendants breached their fiduciary duties by disseminating false and misleading statements.

142.    As a result of the Individual Defendants' breaches fiduciary failures, CURO has been damaged.

143.    Plaintiff, on behalf of CURO, has no adequate remedy at law.

### COUNT II
### For Unjust Enrichment
### Against All Individual Defendants

144.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CURO.

146.    All the payments and benefits provided to the Individual Defendants were at the expense of CURO. The Company received no benefit from these payments.

147.    Plaintiff, on behalf of CURO, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

148.    Plaintiff, on behalf of CURO, has no adequate remedy at law.

**COUNT III**
**Against Defendants Gayhardt, Rippel, Faulkner and McKnight For Contribution Under**
**§§10(b) and 21D of**
**The Exchange Act**

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.    This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Gayhardt, Rippel, Faulkner and McKnight, each of whom is a named defendant in the Securities Action.

151.    CURO is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, among other things, violation of §10(b) of the Exchange Act. If CURO is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of Gayhardt, Rippel, Faulkner and McKnight, as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Action against the Company.

152.     As "controllers" of the Company, defendants Gayhardt, Rippel, Faulkner and McKnight had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about CURO, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

153.     Defendants Gayhardt, Rippel, Faulkner and McKnight are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

154.     Accordingly, CURO is entitled to all appropriate contribution or indemnification from defendants Gayhardt, Rippel, Faulkner and McKnight who are responsible for exposing CURO to liability under the federal securities laws.

## COUNT IV
### Against Defendants Faulkner and McKnight For Insider Trading

155.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

156.     By reason of their positions as directors, defendants Faulkner and McKnight had access to and knew highly material information regarding CURO and knew that the public disclosure of this information would adversely affect the market price of CURO stock.

157.     Defendants Faulkner and McKnight used CURO's non-public information in breach of their fiduciary duties to conduct the Secondary Offering and to sell CURO stock to the public when they knew that material, negative information concerning CURO's current and future business prospects was undisclosed.

158.    Defendants Faulkner and McKnight profited through their fiduciary positions and are obliged to disgorge their unlawful profits to CURO.

### COUNT V
### Against the Private Equity Defendants
### For Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

160.    CURO's Board of Directors owed and owe fiduciary duties to the Company, which they breached for the reasons alleged herein.

161.    The FFL Defendants, who, along with the Founder Defendants, controlled the Company, were aware of the Individual Defendants' fiduciary status. The FFL Defendants aided and abetted, and provided substantial assistance to, the Individual Defendants' filing of false and misleading S-1 Registration Statement and prospectus, which actions were necessary to accomplish their insider trading, and which were in violation of the Individual Defendants' fiduciary duties to the Company.

162.    The FFL Defendants unlawfully profited through aiding and abetting breaches of fiduciary duty, and CURO has sustained damages.

### COUNT VI
### Against the FFL Defendants
### For Aiding and Abetting Insider Trading

163.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

164.    The FFL Defendants knowingly participated in defendants Faulkner and McKnight' insider trading by selling shares motivated in whole or in part by material adverse inside information.

165.    In selling their CURO stock, as set forth above, these defendants used CURO's non-public information for private gain.

166.    These defendants profited through aiding and abetting the insider trading of defendants Faulkner and McKnight and are obliged to disgorge their unlawful profits.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duty, corporate waste and unjust enrichment;

B.    Directing CURO to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CURO and its shareholders from a repetition of the damaging events described herein;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and the state statutory provisions sued hereunder, including attaching, impounding and imposing a constructive trust on or otherwise restricting the proceeds of from the Individual Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of CURO has an effective remedy;

D.    Awarding to CURO restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.    Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 2, 2020

OF COUNSEL:

**SHUMAN, GLENN & STECKER**
Kip B. Shuman
100 Pine Street, Ste. 1250
San Francisco, CA 94111
Tel. (303) 861-3003
Email: kip@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel. (303) 861-3003
Email: rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
Tel. (303) 861-3003
Email: brett@shumanlawfirm.com

**KASKELA LAW LLC**
D. Seamus Kaskela
18 Campus Blvd #100
Newtown Square, PA 19073
Tel. (888) 715-1740

**RIGRODSKY & LONG, P.A.**

By:   */s/ Gina M. Serra*
       Seth D. Rigrodsky (#3147)
       Brian D. Long (#4347)
       Gina M. Serra (#5387)
       300 Delaware Avenue, Suite 1220
       Wilmington, DE 19801
       Telephone: (302) 295-5310
       Facsimile: (302) 654-7530
       Email: sdr@rl-legal.com
       Email: bdl@rl-legal.com
       Email: gms@rl-legal.com

       *Attorneys for Plaintiff*